# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| William Scott Davis, Jr., | Case No. 22-cv-2854 (JRT/DLM) |
| Petitioner, | |
| v. | **ORDER AND REPORT AND RECOMMENDATION** |
| Jared Rardin, Warden F.M.C. Rochester MN; Merrick Garland, U.S.A.G.; and Colett S. Peters, Director F.B.O.P., | |
| Respondents. | |

This case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Petitioner William Scott Davis, Jr., a federal prisoner, brings this petition for habeas corpus relief pursuant to 28 U.S.C. § 2241. Mr. Davis initially filed his petition in November of 2022 (Doc. 1), but in the weeks following, Mr. Davis filed a number of other documents that supplemented his petition (*see, e.g.*, Docs. 18, 19, 20, 22, 23). Rather than consider matters piecemeal, the Court ordered Mr. Davis to file a single, consolidated petition setting forth all of the grounds on which he seeks habeas relief. (Doc. 27.)

In response, Mr. Davis filed an amended petition. (Doc. 42.) The amended petition enumerates exactly 50 grounds for relief, but a closer review of each reveals that some of those grounds are duplicative, while others can be reasonably construed as asserting several theories in one "ground."[1] All to say, Mr. Davis's cataloguing is not particularly useful.

---

[1] For a comprehensive listing of Mr. Davis's grounds for relief, *see* Doc. 111 at 2–4 n.2.

Below, the undersigned recategorizes Mr. Davis's petition into subject matters, with reference to which of his enumerated grounds arguably are included in each category.

Regardless of the organization of Mr. Davis's petition, it does not set forth any bases for relief. The overwhelming majority of Mr. Davis's theories involve matters that are not cognizable in habeas, such as where he is serving his sentence. Others involve complaints that have no remedy, such as asserting that he has not received certain good time credits even though he is already at the statutory cap for credited time. And yet others are direct or veiled attacks on his underlying criminal sentence, something generally reserved for the sentencing court to consider via a motion to vacate his sentence (which Mr. Davis clearly knows, since he unsuccessfully sought this relief in his sentencing District). Finally, for those few grounds that actually may be considered on their merits, Mr. Davis puts forth only conclusory allegations that have been thoroughly dispelled by the government's response. As such, it is recommended that Mr. Davis's petition be denied in its entirety without an evidentiary hearing.[2]

## BACKGROUND

Mr. Davis is a federal inmate who is incarcerated at the Federal Medical Center in Rochester, Minnesota ("FMC-Rochester"). *Federal Bureau of Prisons* ("*BOP") Inmate Locator*, https://perma.cc/G78K-K3TM (last visited January 17, 2024). He is serving a 144-month sentence after a jury found him guilty of one count of cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(5), and three counts of sending threatening

---

[2] Mr. Davis filed a number of motions as well, which remain outstanding. In Section X below, the Court addresses these matters.

communications, in violation of 18 U.S.C. § 875(c). *See United States v. Davis*, No. 5:14-cr-240, Doc. 906 (Judgment) (E.D.N.C. Mar. 29, 2018). Mr. Davis was originally arrested on his federal criminal matter on October 22, 2014. *Id.*, Doc. 8. The three and a half years between arrest and sentencing in Mr. Davis's criminal case were marked by wide ranging proceedings, which included an overwhelming number of pro se filings (highlighted by attempts to recuse and threats to sue Mr. Davis's district judge), competency proceedings, and, ultimately, a trial with standby counsel. *See generally id.* This single defendant criminal matter has resulted in, as of now, 1,131 separate docket entries. *Id.* These entries also include Mr. Davis's motions to vacate his sentence pursuant to 18 U.S.C. § 2255, *id.* at Docs. 919, 1046, and motions for compassionate release, *id.* at Docs. 993, 1027–28, 1049, 1062.[3]

Mr. Davis's statutory release date—that is, the date that he is expected to be released if he were to receive all of the "good conduct time" credit set forth in 18 U.S.C. § 3624(b)— is May 12, 2025. (Doc. 122-1 at 3.) However, Mr. Davis has also qualified for an additional 365 days of early-release credits pursuant to the First Step Act,[4] moving his actual projected release date to May 12, 2024. (Doc. 126-1 at 3.) He filed a petition for habeas corpus relief with this Court on November 7, 2022. (Doc. 1.) As noted in the Court's August 16, 2023 Order, Mr. Davis "has filed a multitude of motions since his petition was

---

[3] The district court in Mr. Davis's criminal matter ultimately denied each of his § 2255 and compassionate release motions. *United States v. Davis*, No. 5:14-cr-240, Docs. 1066, 1079–80, 1106 (E.D.N.C.).

[4] The First Step Act of 2018 introduced amendments to a number of statutes governing time credits, early release, and early prerelease custody for federal prisoners. *See generally* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018).

filed," (Doc. 128), including some which appeared to supplement his habeas petition. Subsequently (and in response to this Court's direction), Mr. Davis filed an amended habeas petition, which included all of his grounds for relief, on March 6, 2023. (Doc. 42.) The government filed its response, together with a number of declarations and exhibits, on August 14, 2023 (Docs. 120 (Response), 121–26 (Declarations & Exhibits)). Any response by Mr. Davis was due within 30 days (Doc. 10), but none was filed. Instead, on August 24, 2023, Mr. Davis filed a motion seeking "up until December 31st 2023" to reply to the government's response. (Doc. 130.) The Court denied Mr. Davis's motion for failure to comply with the Court's prior Order requiring leave before filing any such motions. (Doc. 131 (citing Doc. 128).) Mr. Davis has filed no reply at all to the government's response—timely or not—and the date for which he sought to move his deadline has now passed. Further background evidence will be set forth below as relevant to the analysis of Mr. Davis's claims.

## ANALYSIS

## I.    Mr. Davis's collateral attacks on his criminal conviction and sentence are not cognizable via this § 2241 petition.

In Mr. Davis's amended petition, he checked the box "No" in answer to the question of whether he was challenging the validity of his conviction or sentence. (Doc. 42 at 2 ¶ 10.) However, as the government correctly notes, Grounds 6, 7, 22, 23, 28, 46, and 49 all concern the validity of his conviction and sentence: Ground 6 challenges Mr. Davis's Presentence Report ("PSR") as inaccurate; Ground 7 contends that his Judgment and Commitment order listed the wrong conviction; Ground 23 accuses the government of

Brady[5] violations; Ground 28 specifically attacks Mr. Davis's sentence and conviction; Grounds 22 and 46 assert the BOP has improperly denied him access to his PSR (which he claims he needs to attack his conviction and sentence); and Ground 49 purports to incorporate Mr. Davis's "§ 2255 filings." (*Id.* at 8, 11, 16–19, 23.) Mr. Davis also filed a standalone motion to attack his criminal conviction and sentence, separate from his habeas petition. (Doc. 54.)

A prisoner seeking to challenge the validity of his conviction or sentence must file a motion to vacate pursuant to 18 U.S.C. § 2255. *Nichols v. Symmes*, 553 F.3d 647, 649 (8th Cir. 2009). That motion must generally be filed in the district where the prisoner was sentenced. *Jones v. Hendrix*, 599 U.S. 465, 472 (2023). Petitions brought pursuant to 18 U.S.C. § 2241 are attacks on the execution of a prisoner's sentence, generally brought where the person is incarcerated. *Nichols*, 553 F.3d at 649.

Mr. Davis has already sought § 2255 relief in his sentencing District. *See United States v. Davis*, No. 5:14-cr-240, Docs. 919, 1046. He lost. *Id.* at Doc. 1080 (E.D.N.C. Apr. 14, 2022). In *Jones v. Hendrix*, the Supreme Court recently clarified that the grounds for seeking § 2241 habeas relief rather than moving for relief via § 2255 are extremely narrow. 599 U.S. at 471–78. There, the Court refused to extend § 2255(e)'s "saving clause" (that is, the section of § 2255 which allows a prisoner to forego a § 2255 motion if "the remedy by motion is inadequate or ineffective to test the legality of detention") to all but the most exceptional § 2241 habeas petitions. *Id.* By *Jones*, a § 2241 attack on a prisoner's sentence

---

[5] *Brady v. Maryland*, 373 U.S. 83 (1963).

may be permitted where the prisoner could not bring a § 2255 claim because of logistical issues making it impracticable to do so, but not for much else. *Id.* at 475–76.

Mr. Davis does not suggest that his case falls within an exceptional circumstance making it impossible or impracticable to attack his sentence or conviction via a § 2255 motion. In fact, he pursued that relief with his sentencing court not long before filing his original § 2241 petition with this court. *United States v. Davis*, No. 5:14-cr-240, Doc. 1042 (E.D.N.C. filed Feb. 22, 2022). As such, the Court finds no basis to entertain Mr. Davis's collateral attacks on his sentence or conviction through the § 2241 habeas petition he filed in this District, nor through the related standalone motion within this action, which the Court recommends be denied.

## II.    Mr. Davis's complaints about not being transferred to a halfway house or home confinement are not cognizable habeas claims and otherwise have no merit.

In several areas of his petition, Mr. Davis complains that he has not been transferred to home confinement or to a halfway house (also known as a Residential Reentry Center or "RRC") placement. In Grounds 4, 15, 18, and 32, he claims he should have already been released to a halfway house or home confinement because his good time has not been properly calculated. (Doc. 42 at 6, 10, 20.) In Grounds 7 and 21, he complains that he was not granted home confinement under the CARES Act. (*Id.* at 8, 11.) Ground 9 follows the theme, stating he should already be released to home confinement or a halfway house. (*Id.*) Similarly, in Grounds 20, 36, and 42, Mr. Davis complains that he was not placed on home confinement pursuant to the Elderly Home Confinement Program.[6] (*Id.* at 11, 21-22.) In

---

[6] 34 U.S.C. § 60541(g).

Grounds 13, 14, 16, and 46, Mr. Davis asserts that it is a failure of the BOP that he is not in a halfway house or on home confinement given his age and disabilities. (*Id.*) Ground 24 asserts that he was denied a halfway house placement under the Second Chance Act[7] for impermissible reasons, a theme repeated in Ground 41 as it relates to home confinement. (*Id.* at 12.) Ground 31 claims that the BOP failed to assess his individual needs in not granting him a halfway house placement, as does Ground 34 (but expanded to include denial of home confinement). (*Id.* at 20–21.) Finally, Ground 45 asserts that the BOP has failed to properly interpret 18 U.S.C. § 3621(b), which governs the place of imprisonment. (*Id.* at 22.)

In each of his assertions, Mr. Davis challenges his placement, preferring a halfway-house or home confinement to being incarcerated at FMC-Rochester. In this Circuit and District, claims seeking that type of relief are generally considered claims challenging the *place* of confinement. *See United States v. Houck*, 2 F.4th 1082, 1085 (8th Cir. 2021) (discussing home confinement as a place of confinement); *Elwood v. Jeter*, 386 F.3d 842, 846 (8th Cir. 2004) (halfway house "is a penal or correctional facility and a place of imprisonment"); *see also Williams v. Birkholz*, No. 20-cv-2190 (ECT/LIB), 2021 WL 4155614, at *6 (D. Minn. July 20, 2021) ("A prisoner is transferred to home confinement not released to home confinement because home confinement is a place of incarceration.") (citation omitted), *R. & R. adopted*, 2021 WL 4155013 (D. Minn. Sept. 13, 2021). And a "legal action seeking transfer from one form of BOP custody to another (like a legal action

---

[7] Second Chance Act of 2007, Pub. L. No. 110–199, 122 Stat. 657 (2008).

seeking transfer from one BOP facility to another) is not a challenge to the fact or duration of confinement." *Johnson v. Birkholz*, 21-cv-2017 (PJS/LIB), 2022 WL 3135304, at *1 (D. Minn. Aug. 5, 2022). The Court has no jurisdiction to entertain a challenge to a prisoner's place of confinement via a habeas petition. *Id.*

Even if considered on the merits, Mr. Davis's claims would fare no better. At bottom, his complaint is that the BOP has not placed him in a halfway house or on home confinement in violation of its statutory obligations, constitutional obligations, or both. But "[t]he BOP has the exclusive authority to designate where an inmate will serve [their] sentence," and "placement decisions are not reviewable." *Blocher v. Eischen*, No. 22-cv-0678 (PJS/DTS), 2022 WL 17406549, at *3 (D. Minn. Nov. 3, 2022) (citing 18 U.S.C. § 3621(b)), *R. & R. adopted*, 2022 WL 17404447 (D. Minn. Dec. 2, 2022); *see also United States v. Vang*, No. 16-cr-0277 (DWF/KMM), 2020 WL 4704875, at *2 (D. Minn. Aug. 13, 2020) ("Courts have consistently held that placement questions are not reviewable.") (citing 18 U.S.C. § 3621(b)) (collecting cases). Thus, the BOP's placement decisions— including whether and when Mr. Davis is placed in a halfway house or on home confinement—are generally not subject to judicial review. *Khdeer v. Paul*, No. 18-cv-2112 (ECT/BRT), 2018 WL 6919637, at *4 (D. Minn. Nov. 29, 2018), *R. & R. adopted*, 2019 WL 79318 (D. Minn. Jan 2, 2019); *cf. United States v. Acosta-Cruz*, No. 11-cr-002(4) (SRN/FLN), 2018 WL 5801900, at *3 (D. Minn. Nov. 6, 2018) ("[A] prisoner does not have an enforceable legal right to a 12-month pre-release RRC placement.") (citation omitted).

To the extent that Mr. Davis's claims could be broadly read to suggest BOP's refusal to move him to community confinement was contrary to law or violated the Constitution (a possible exception to § 3625's bar on judicial review of BOP discretionary decisionmaking, *see Khdeer¸* 2018 WL 6919637, at *5), his claims lack merit. On the contrary, the BOP's decision not to move Mr. Davis to a halfway house is precisely *because* it conducted the individualized assessment required by 18 U.S.C. § 3621(b): the BOP determined that Mr. Davis's significant medical needs could not be accommodated by a halfway house, and he lacked a suitable release address for a home confinement placement. (Doc. 126 ¶¶ 36–48.) Finally, because Mr. Davis "does not have a constitutionally protected liberty interest in serving his sentence at a particular institution," he "has no constitutional right to a pre-release RRC or home confinement placement." *Khdeer*, 2018 WL 6919637, at *5 (citations omitted).

## III.   Mr. Davis's compassionate release claims are not cognizable through this § 2241 habeas petition.

In at least three of his Grounds (19, 30, and 47), Mr. Davis suggests that he should be released (or, more accurately, that the government has violated his rights in *not* releasing him) pursuant to 18 U.S.C. § 3582(c)(1)(A). As relevant here, § 3582(c)(1)(A) permits a court to modify a prisoner's sentence based on "extraordinary and compelling" circumstances. Requesting such relief is commonly referred to as a motion for compassionate release. *United States v. Sims*, 87 F.4th 917, 919 (8th Cir. 2023). But because § 3582(c) motions seek to modify a person's original sentence, they must be brought before the original sentencing court. *Ybarra v. Kallis*, No. 21-cv-2062

(ECT/KMM), 2021 WL 5235335, at *1 (D. Minn. Oct. 1, 2021), *R. & R. adopted,* 2021 WL 5235141 (D. Minn. Nov. 10, 2012); *see also Chicoine v. Segal*, No. 23-cv-1217 (KMM/TNL), 2023 WL 5337085, at *2 (May 30, 2023), *R. & R. adopted,* 2023 WL 5333772 (D. Minn. Aug. 18, 2023). This Court "has no authority to modify pursuant to § 3582(c) a sentence imposed in another venue." *Boos v. Kallis*, No. 21-cv-2177 (SRN/BRT), 2022 WL 2541751, at *1 (D. Minn. Jun. 15, 2022) (quoting *Ybarra*, 2021 WL 5235335, at *1), *R. & R. adopted,* 2022 WL 2533374 (D. Minn. Jul. 7, 2022).

As noted above, Mr. Davis was sentenced in the Eastern District of North Carolina. Any motion to modify his sentence must be considered by that court, not this one. Mr. Davis has, in fact, filed a number of compassionate-release motions seeking to modify his sentence with that court, *see, e.g.*, *United States v. Davis*, No. 5:14-cr-240, at Docs. 970, 998, 993, 1027, 1028, 1041, 1049, 1052, 1062, 1069, 1072, including a Notice of Appeal that post-dated the filing of his habeas petition with this Court, *id.* at Doc. 1107 (E.D.N.C. filed Nov. 14, 2022). As such, there appears to be no impediment Mr. Davis seeking § 3582(c) relief in his sentencing court, and no excuse for seeking it via § 2241 habeas petition here.

## IV.    The BOP correctly computed Mr. Davis's sentence.

Mr. Davis also complains (in Grounds 4, 27, and arguably 35) that the BOP improperly calculated his sentence such that he is serving more time in custody than he should. These arguments are properly considered via a § 2241 habeas petition, since they involve the duration of confinement.

On March 22, 2018, Mr. Davis was sentenced to 144 months of imprisonment. *United States v. Davis*, No. 5:14-cr-240 at Doc. 906 (E.D.N.C. Mar. 29, 2018).[8] Under 18 U.S.C. § 3585, an offender like Mr. Davis is entitled to credit toward his sentence "for any time spent in official detention." *United States v. Tindall*, 455 F.3d 885, 888 (8th Cir. 2006) (citing 18 U.S.C. § 3583(b)(2)). Once a federal court sentences an offender, it is up to the Attorney General to determine what time credit the offender receives toward that sentence. *United States v. Wilson*, 503 U.S. 329, 333–34 (1992).

Mr. Davis was arrested for his underlying offense on October 22, 2014. *United States v. Davis*, No. 5:14-cr-240 at Doc. 8 (E.D.N.C. Oct. 22, 2014); (*see also* Doc. 122-2). He remained in some form or another of federal custody (between traditional pretrial detention and competency proceedings) continuously until his sentencing. (Doc. 122-3.) The period of Mr. Davis's federal pretrial detention—from his October 22, 2014 arrest through March 22, 2018 sentencing—was 1,247 days. According to the inmate data sheet submitted by the government, Mr. Davis received 1,247 days of credit toward his sentence. (Doc. 122 ¶ 12; Doc. 122-1 at 3.) Given the unrefuted evidence that the BOP correctly calculated Mr. Davis's sentence, there is no habeas relief available to Mr. Davis based on BOP calculation errors.

---

[8] Although judgment was entered on March 29, 2018, Mr. Davis's sentencing court imposed that judgment at sentencing on March 22, 2018. *See United States v. Davis*, No. 5:14-cr-240 at Docs. 903 (E.D.N.C. Mar. 22, 2018) (minute entry for sentencing proceeding), 906 (E.D.N.C. Mar. 29, 2018) (judgment and commitment order stating judgment imposed March 22, 2018).

**V.    There is no basis to grant relief for Mr. Davis's concerns regarding his accrual of First Step Act time credits.**

In late 2018, the First Step Act was enacted into law, ushering in a number of changes to federal inmate programming and, as most relevant here, good time credits. If an inmate participates in evidence-based recidivism reduction programing, they may earn First Step Act time credits ("FTC") at a rate of 10 or 15 days for every 30 days of programming. 18 U.S.C. § 3632(d)(4)(A)(i) & (ii). FTCs "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C). A prisoner's FTCs may be used to transfer them out of custody and onto supervised release up to 12 months early. 18 U.S.C. § 3624(g)(3).

Mr. Davis raises a number of issues related to his FTCs. In Grounds 3, 4, 9, 15, 18, and 40, he contends that if the BOP had applied his FTCs correctly, he would be at a halfway house or on home confinement by now. But as discussed in Section II above, Mr. Davis's preference for being in custody somewhere other than a prison (that is, in community confinement) is generally not a cognizable habeas claim.

In Grounds 3, 4, 15, 27, 32, 35, and 40, Mr. Davis asserts (in one way or another) that he ought to be released already entirely because, if correctly calculated, his FTCs eclipse the rest of his sentence.[9] But the amount of FTCs that can be applied to early release is limited to 12 months' worth, *see* 18 U.S.C. § 3624(g)(3), and Mr. Davis has already reached the maximum amount, (Docs. 126 ¶ 22; 126-8 at 1 ("FTC Towards Release: 365").

---

[9] As noted above, a number of Mr. Davis's Grounds for Relief can arguably be read as asserting discrete, sometimes overlapping arguments, explaining why certain Grounds are cited several times in different sections of this Report and Recommendation.

The effect of this is that Mr. Davis's FTCs have accelerated his release date to May 12, 2024, rather than his statutory release date of May 12, 2025. (Docs. 122 ¶ 12; 122-1 at 3.) Habeas relief is not available to further reduce Mr. Davis's incarcerative sentence beyond § 3624(g)(3)'s 12-month cap.

There remains the question of whether Mr. Davis raises a justiciable claim that the BOP withheld some FTCs that could reduce his term of supervised release. He makes no such claim directly through his 50 Grounds for Relief. However, in Ground 9 he cites various provisions of the First Step Act, followed by the statement "Should have already been release[d] RRC/HC applied to supervised release." (Doc. 42 at 8.) The Court, broadly and liberally construing this portion of the petition, *see Frey v. Schuetzle*, 78 F.3d 359, 361 (8th Cir. 1996) ("as a general rule a *pro se* habeas petition must be given a liberal construction"), finds that the phrase "applied to supervised release" might be asserting that Mr. Davis has been unlawfully deprived of FTCs that could be used to shorten his term of supervised release.

While Mr. Davis has reached the maximum number of FTC days for early release, he has accrued an additional 310 days beyond that. (Doc. 126-8.) The government characterizes these as "FTCs toward pre-release placement in an RRC or home confinement," which is consistent with the description on the BOP's FSA Time Credit Assessment document. (Docs. 120 at 67; 126-8 at 1.) If that description were accurate, there would be no relief for Mr. Davis since complaints about not being placed in a halfway house or on home confinement deal with the place of confinement, not the fact or duration of the sentence. But the government's description is not altogether accurate. Rather, by

13

statute, these residual FTCs "shall be applied toward time in prerelease custody *or* supervised release." 18 U.S.C. § 3632(d)(4)(C). One court has ascribed to the view that the above language "provides that [FTCs] may be applied to [reduce] a term of supervised release." *Dyer v. Fulgham*, No. 1:21-cv-0299 (CLC/CHS), 2022 WL 1598249, at *3 (E.D. Tenn. May 20, 2022). But there is a long and growing line of cases holding to the contrary, both within and outside this Circuit:

> Since *Dyer*, other courts to consider this issue have declined to follow *Dyer's* reasoning. *Orasco v. Yates*, No. 2:22-cv-156, 2022 WL 18027627, at *3 n.4 (E.D. Ark. Dec. 12, 2022) ("[W]hile the [FSA's time credit] program permits early transfer to supervised release, it does not grant the BOP authority to reduce or shorten a prisoner's term of supervised release."); *Harrison v. Fed. Bureau of Prisons*, No. 22-14312, 2022 WL 17093441, at *1 (S.D. Fla. Nov. 21, 2022); *Pillow v. Bureau of Prisons*, No. 4:22-cv-713, 2022 WL 13892877, at *7 (E.D. Ark. Oct. 21, 2022); *see also Mero v. Yates*, No. 2:22-cv-72, 2022 WL 17653228, at *1 n.2 (E.D. Ark. Sept. 27, 2022) ("The 'earned time credits' [defendant] seeks affect when he is eligible for transfer into prelease custody, but do not reduce his sentence or his term of supervised release."); *Komando v. Luna*, No. 22-cv-425, 2023 WL 310580, at *3 (D.N.H. Jan. 13, 2023) ("FSA time credits, when applied, advance the date when the prisoner will be placed in 'prerelease custody' (including home confinement or residential reentry facilities), or accelerate the date when the prisoner will leave BOP custody to start a term of court-imposed supervised release.").

*United States v. Calabrese*, No. 1:11-cr-00437, 2023 WL 1969753, at *2 (N.D. Ohio Feb. 13, 2023). The *Calabrese* court's statutory interpretation provides persuasive reasoning against reducing a prisoner's supervised release term with FTCs:

> If § 3632(d)(4)(C) provided that time credits shall be applied *to reduce a term of supervised release*, then the Court might agree with the decision reached in *Dryer*. But the statute provides that time credits shall be applied *toward* supervised release. Use of the word "toward" means that credits can be applied to bring "time in prerelease custody or supervised release" closer to occurring because credits applied "toward" something generally means to bring that something closer to happening. Black's Law Dictionary (11th ed.

> 2019) (defining "toward," in relevant part, as "in the direction of; on a course or line leading to (some place or something)").

*Id.* at *2. Perhaps this is why "[e]very court to consider *Dyer* and *Calabrese* has sided with *Calabrese*." *United States v. Calhoun*, No. 3:08-cr-0077 (DPJ/LGI), 2023 WL 7930053, at *3 (S.D. Miss. Nov. 16, 2023) (citing *Gonzalez v. Pierre-Mike*, No. 1:23-cv-11665 (IT), 2023 WL 5984522, at *5 (D. Mass. Sept. 14, 2023)).

This Court agrees that "the *Calabrese* construction is more faithful to the statutory text." *Id.* at *3. Beyond that, this construction "aligns with the applicable regulation," which permits FTCs to be applied toward early *transfer* to supervised release, not to shortening of supervised release. *Id.* (citing 28 C.F.R. § 523.44(d)). And finally, allowing FTCs to reduce a term of supervised release would contravene the purpose of supervised release, which "serves rehabilitative ends distinct from those served by incarceration." *Gonzalez*, 2023 WL 5984522, at *5 (citation omitted); *accord United States v. Johnson*, 529 U.S. 53, 59 (2000) (refusing to apply excess prison time to reduce the length of supervised release). The First Step Act modified much when it comes to sentencing and detention, but it cannot reasonably be read as potentially eliminating supervised release, particularly for those serving the longest sentences who may need "supervised release to assist . . . in their transition to community life."[10] *Johnson*, 529 U.S. at 55. To the extent Mr. Davis's habeas petition could be liberally construed to suggest he was entitled to

---

[10] Because FTCs accrue at a ratio based on days in programming, 18 U.S.C. § 3632(d)(4), prisoners serving longer sentences have the opportunity to earn the most FTCs (all other things being equal).

additional FTCs to shorten his supervised release, the Court finds no basis for granting such relief.

**VI.    The government did not unlawfully prevent Mr. Davis from participating in the BOP's Residential Drug Abuse Program ("RDAP") regimen.**

Mr. Davis challenges the BOP's determination that he was not eligible to participate in RDAP. To the extent he makes argument at all (*See* Doc. 42 at Grounds 5, 33, 43), Mr. Davis argues that he was wrongfully excluded from RDAP based on a prior assault conviction, which the BOP improperly classified as a disqualifying crime of violence.

By statute, the BOP is required to offer residential substance abuse treatment to "every prisoner with a substance abuse problem." 18 U.S.C. § 3621(e)(1)(C). Accordingly, the BOP screens prisoners for participation in its Residential Drug Abuse Program, commonly referred to as RDAP. 18 U.S.C. § 3621(e)(5)(B). If a person participates in and successfully completes RDAP, they are eligible to receive up to a year's reduction in their prison sentence. *Id.* § 3621(e)(2)(B). "As several courts have noted, the RDAP has proved popular with prisoners because, beyond its rehabilitative potential, it also provides the possibility of a one-year early release." *Stanciel v. Holinka*, No. 6-cv-3730 (PJS/SRN), 2008 WL 304889, at *2 (D. Minn. Jan. 31, 2008) (cleaned up, citations omitted). But this sentence-reduction incentive is only available to those RDAP graduates "convicted of a nonviolent offense." 18 U.S.C. § 3621(e)(2)(B). "The measure thus categorically denies early release eligibility to inmates convicted of violent offenses." *Lopez v. Davis*, 531 U.S. 230, 238 (2001).

The Supreme Court has long held that the BOP has some discretion to advance regulations to fill the gap in RDAP's statutory scheme. *Id.* at 239–44. Mr. Davis does not quarrel with this proposition generally, but argues the BOP went too far in rejecting him from RDAP based on his prior record. Specifically, he appears to argue that the BOP used an overbroad definition of what is a crime of violence, then applied that definition to disqualify him from participating in RDAP as a violent offender. (Doc. 42 at Grounds 5, 33, 43.)

Here, Mr. Davis's contentions fail as a matter of fact. The government has submitted a declaration from Dr. Melissa Klein, the Chief of Psychology at FMC-Rochester. (Doc. 124.) According to Dr. Klein, Mr. Davis was screened for RDAP on July 15, 2022. As mentioned above, one of the key qualifications for RDAP eligibility is that the prisoner *actually have* a substance abuse problem, 18 U.S.C. § 3621(e)(5)(B), something the BOP tests through verifiable information focusing on the year before a person's arrest. (Docs. 124 ¶ 5; 124-1 at 27–28 (BOP Program Statement 5330.11[11])); *see also Stanciel*, 2008 WL 304889, at *2–4. For Mr. Davis, there was no such information. To the contrary, Mr. Davis's PSR he had indicated "no history of substance abuse or treatment for substance abuse programs." (Docs. 124 ¶ 8; 124-3 at 1.) It is true that Mr. Davis's screening summary also indicates that his violent criminal history may preclude his participation in RDAP.

---

[11] Mr. Davis does not challenge the BOP's authority or criteria for determining whether a person has a verifiable substance abuse disorder. *Accord Frey*, 78 F.3d at 361 (while courts must liberally construe pro se habeas petitions, "federal courts should not grant habeas relief to a petitioner based upon a legal theory that involves an entirely different analysis and legal standards than the theory actually alleged by the petitioner").

(Doc. 124-3 at 1.) But because Mr. Davis was otherwise ineligible for RDAP, the BOP's characterization of his criminal history is of no moment: without evidence of a substance abuse problem, Mr. Davis would not be admitted into RDAP. He provided no such information, rendering it unnecessary to reach the issue of whether Mr. Davis was wrongfully excluded from RDAP based on the BOP's characterization of his criminal history.[12]

## VII. Mr. Davis's challenges to his disciplinary proceedings fail.

In Grounds 1 and 26 of his petition, Mr. Davis alleges that he was denied due process in prison disciplinary proceedings, resulting in the loss of good conduct time ("GCT"). (Doc. 42 at 7, 14–15.) Although Mr. Davis was the subject of at least nine disciplinary proceedings (Doc. 123-3), he primarily focuses on the proceedings associated with four incident reports: 3145493, 3146610, 3229937, and 3354941 (Doc. 42 at 15). The government suggests that it was only these four incident reports that resulted in the loss of GCT, something borne out by the record (and which Mr. Davis does not dispute). (Docs. 120 at 25; 123-3.) The Court agrees that its focus is appropriately trained only on those disciplinary proceedings for which Mr. Davis lost GTC. *Accord Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) ("If the prisoner is not challenging the validity of his

---

[12] Even if Mr. Davis could show an entitlement to *participate* in RDAP, there would likely be no basis to grant his habeas petition to reduce his sentence. *Davis v. English*, No. 12-cv-1483 (JNE/LIB), 2013 WL 1149526, at *6 (D. Minn. Feb. 27, 2013) (rejecting habeas petition seeking RDAP sentence reduction where petitioner was not even admitted to the program as "entirely speculative"), *R. & R. adopted*, 2013 WL 1149769 (D. Minn. Mar. 19, 2013).

conviction or the length of his detention, such as loss of good time, then a writ of habeas corpus is not the proper remedy.").

Courts have long held that a prisoner's good time involves a constitutionally-protected liberty interest, which cannot be forfeited absent due process. *Wolff v. McDonnell*, 418 U.S. 539, 555–57 (1974). Because of the "distinctive setting of a prison," however, the process due to prisoners facing the loss of good time may be less than in other circumstances. *Superintendent, Massachusetts Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985); *Freitas v. Auger*, 837 F.2d 806, 808 (8th Cir. 1988). A prisoner is entitled to (1) advance notice of the charges; (2) a hearing that includes the opportunity to present evidence (when consistent with the prison's safety and correctional goals); and (3) a written statement by the factfinder of the evidence credited and the reasons for the disciplinary action. *Hill*, 472 U.S. at 454.

In order to prevent "arbitrary deprivations" of liberty, the notice of charges should be in writing and set forth at least some specific facts underlying the accusation, so that a prisoner can prepare a defense. *See Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007) (holding that notice that contained no information about the victim, date, or place of alleged assault was not sufficient because if prisoner was innocent, "he would be uncertain of what evidence, such as an alibi, could refute the allegation"). "The adequacy of the notice hinges on whether it allows the inmate to 'marshal the facts' and prepare a defense." *Freitas*, 837 F.2d at 809 (quoting *Wolff*, 418 U.S. at 564).

Once a prisoner receives notice of the charges, they are generally entitled to a hearing on the matter. *Hill*, 472 U.S. at 454. Such a hearing may include the ability "to call

19

witnesses and present documentary evidence," so long as doing so "will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566; *see also id.* at 567 (because "[c]onfrontation and cross-examination present greater hazards to institutional interests," the procedures are not constitutionally required in prison disciplinary hearings). Prison officials have "broad discretion to limit an inmate's right to call witnesses," but may need to explain the reasons for doing so. *Espinoza v. Peterson*, 283 F.3d 949, 953 (8th Cir. 2002); *Arias v. Barnes*, No. 19-cv-1326 (JRT/KMM), 2019 WL 9244885, at *6 (D. Minn. Oct. 21, 2019), *R. & R. adopted*, 2020 WL 3642313 (D. Minn. July 6, 2020).

As it relates to the evidence relied upon, "the requirements of due process are satisfied if some evidence supports the decision" to revoke GTC. *Hill*, 472 U.S. at 455. "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455–56. The evidence that supports a prison's disciplinary decision may include testimony or written reports. *Id.* at 456–57.

With these standards in mind, the Court addresses the disciplinary incidents resulting in the loss of Mr. Davis's GCT. The BOP's disciplinary process is the same for each of those incidents. The process begins when a staff member witnesses or reasonably believes a prisoner committed a prohibited act. 28 C.F.R. § 541.5(a). BOP staff then prepares an incident report, which should include all relevant details, and provides it to the

inmate within 24 hours. *Id.*; *see also* BOP Program Statement ("PS") 5270.09, *Inmate Discipline Program*, Ch. 2, § 541.5(a).[13] BOP staff then undertake an investigation, which generally includes informing the subject of the allegations of their rights to make a statement (or remain silent) and identify other evidence relevant to the investigation. 28 C.F.R. § 541.5(a)(1) & (2); PS 5270.09, Ch. 2. Once the investigation is complete, the matter is referred to the Unit Discipline Committee ("UDC") for review and a hearing. 28 C.F.R. § 541.7. Members of the UDC "will not be victims, witnesses, investigators, or otherwise significantly involved in the incident." *Id.* § 541.7(b). Typically, UDC hearings take place within five work days from issuance of the incident report. *Id.* § 541.7(c). The subject may appear in person or electronically for the UDC hearing, "except during UDC deliberations or when your presence would jeopardize institution security, at the UDC's discretion." *Id.* § 547.1(d). An inmate is entitled to make a statement and present documentary evidence at the UDC hearing, and the UDC will then decide the matter based on the greater weight of the evidence. *Id.* § 547.1(e).

Depending on the seriousness of the charge, the UDC may (or for certain prohibited acts, must) refer the matter to a Discipline Hearing Officer ("DHO") for further review. *Id.* § 541.7(a)(3) & (4). Like the UDC, a DHO "will be an impartial decision maker who was not a victim, witness, investigator, or otherwise significantly involved in the incident." *Id.* § 541.8(b). The subject of the discipline is entitled to appear at the DHO's hearing, except during deliberations or when institutional security is jeopardized. *Id.* § 541.8(e). The

---

[13] *Available at* https://perma.cc/ZR9F-ZW2F (last visited Jan. 18, 2024).

subject may make a statement, present documentary evidence and, in some circumstances, present witnesses on their behalf. *Id.* § 541.8(f). The subject is also entitled to a staff representative to assist them at the DHO's hearing. *Id.* § 541.8(d). An inmate may request the staff representative of their choice, but if that person is not available, the institution's warden will appoint another one. *Id.* The DHO will decide whether the charged prohibited acts occurred based on the greater weight of the evidence. *Id.* § 541.8(f). If the DHO determines that the incident occurred, they will impose sanctions within the range that is set forth by regulation based on the type of prohibited act. *Id.* § 541.8(g); *see also* § 541.3 (categorizing prohibited acts and available sanctions). A sanctioned inmate is entitled to a written copy of the DHO's decision, setting forth the evidence relied upon, the sanction, and the reasons for its imposition. *Id.* § 541.8(h). Although not set out in regulation, BOP policy directs that an inmate receive the DHO's decision "ordinarily within 15 work days of the decision." PS § 5270.009, Ch. 5. An inmate unhappy with the UDC or DHO decision may appeal through the Administrative Remedy Program set forth at 28 U.S.C. §§ 542.10– .19.; 541.7(i); 541.8(i).

### A.    Incident Report 3145493

According to the initial Incident Report 3145493, a corrections officer was making daily rounds in Mr. Davis's unit at 8:30 a.m. on July 13, 2018. (Doc. 123-4.) In response to a wellness check, Mr. Davis began yelling obscene and graphic language, threatening to mutilate and kill the corrections officer. (*Id.*) The incident report was provided to Mr. Davis about 4 hours later, at which time, Mr. Davis was advised of his disciplinary process rights. (*Id.* at 2.) Mr. Davis ignored the BOP investigator and refused to make a statement. (*Id.*)

The matter was referred to the UDC, who held a hearing on July 19, 2018. (*Id.* at 1.) Mr. Davis told the UDC he was legally blind, incompetent, and did not understand the institutional rules or disciplinary process. (*Id.*) Given the severity of the incident, the UDC referred the matter to a DHO. (*Id.*) Mr. Davis was advised of his DHO hearing rights, but refused to sign a form acknowledging those rights, saying he did not understand the process and wanted his lawyer. (Doc. 123-5 at 1–2.)

On July 23, 2018, at 12:00 p.m., the DHO held a disciplinary hearing. (Doc. 123-7.) According to the DHO report, Mr. Davis "became belligerent and disruptive" at the outset of the proceedings. (*Id.* at 2.) Mr. Davis was warned to cease his behavior, but did not. (*Id.*) Instead, Mr. Davis spoke over the DHO and expressed a number of racial slurs. (*Id.*) Ultimately, Mr. Davis was removed from the hearing and returned to his cell, with the DHO determining that Mr. Davis's decision to exhibit "this unacceptable behavior identified [his] unwillingness to participate in the disciplinary hearing." (*Id.*)

In a report dated February 18, 2019, the DHO found that the greater weight of the evidence supported that Mr. Davis had engaged in threatening conduct. (*Id.* at 2–3.) Mr. Davis was sanctioned with (among other things) the loss of 27 GCT days for threatening bodily harm. (*Id.* at 2.) Mr. Davis was provided with a copy of the DHO report on April 17, 2019. (*Id.* at 4.)

## B.    Incident Report 3146610

Just three days after the circumstances giving rise to Incident Report 3145493, Mr. Davis was again charged with threatening bodily harm. (Doc. 123-8.) At 3:13 p.m. on July 16, 2018, Mr. Davis "began a verbal onslaught of racist names" toward a corrections

officer, followed by threats to have the officer killed. (*Id.* at 1.) The incident report was delivered to Mr. Davis about three hours later. (*Id.*) Mr. Davis informed the investigator that he understood his rights and did not want to make a statement. (*Id.* at 2) The matter proceeded to a hearing before the UDC on July 19, 2018.[14] (*Id.*) Mr. Davis told the UDC he was legally blind, incompetent, and did not understand the institutional rules or disciplinary process. (*Id.*) Given the severity of the incident, the UDC referred the matter to a DHO. (*Id.*) Mr. Davis was advised of his DHO hearing rights, but refused to sign a form acknowledging those rights, saying he did not understand the process and wanted his lawyer. (Docs. 123-9; 123-10.)

On July 23, 2018, at approximately 12:10 p.m., the DHO held a hearing regarding Incident Report 3145493. (Doc. 123-11.) The hearing report indicates that the hearing took place shortly after the hearing for Incident Report 3146610, and the report's discussion of Mr. Davis's conduct is the same for both reports: Mr. Davis "became belligerent and disruptive" at the outset of the proceedings; Mr. Davis was warned to cease his behavior; and Mr. Davis instead spoke over the DHO and expressed a number of racial slurs. (*Id.* at 2.) Ultimately, Mr. Davis was removed from the hearing and returned to his cell, with the DHO determining that exhibiting "this unacceptable behavior identified [Mr. Davis's] unwillingness to participate in the disciplinary hearing." (*Id.*)

---

[14] According to the documentary evidence, the UDC hearings for Incident Reports 3145493 and 3146610 happened within minutes of each other on July 19, 2018. (*Compare* Doc. 123-4 at 1 *with* Doc. 123-8 at 1.)

In a report dated February 18, 2019, the DHO found that the greater weight of the evidence supported that Mr. Davis had engaged in threatening conduct. (*Id.* at 2–3.) Although the disciplinary regime contemplates that repeated conduct may result in progressive discipline, *see* 28 C.F.R. § 541.3, Table 2, the DHO did not impose a greater sanction for Mr. Davis's conduct here than for the (similarly threatening) conduct he had engaged in three days earlier. Rather, just like in Incident Report 3145493, Mr. Davis was sanctioned with the loss of 27 GCT days for threatening bodily harm. (*Id.* at 2.) Mr. Davis was provided with a copy of the DHO report on April 17, 2019. (*Id.* at 4.)

### C.    Incident Report 3229937

On March 3, 2019, at approximately 6:45 a.m., a corrections officer found a flash drive in the hollow tube of Mr. Davis's wheelchair. (Doc. 121-4.) Flash drives are unauthorized devices for Mr. Davis. (*Id.*) The incident report was delivered to Mr. Davis at 7:00 a.m. on March 4, 2019—24 hours and 15 minutes after the incident. (*Id.* at 1.) Mr. Davis was read his rights by the investigator, indicated he understood them, and made no statement about the incident to the investigator. (*Id.* at 2.) The matter proceeded to a hearing before the UDC on March 8, 2019. (*Id.* at 1.) Mr. Davis submitted a written statement that he had received the flash drive while at another federal prison by a prison counselor, that it was sent to him by his attorney, and that it had legal information relevant to his criminal proceedings. (*Id.* at 3.) In this same statement, Mr. Davis provided citations to relevant sections of the Code of Federal Regulations and BOP Policy Statements, raising legal arguments not unlike ones in this habeas petition or filed in his underlying criminal matter. (*Id.*) Yet Mr. Davis also asserted that he did not understand or comprehend "anything" and

25

was "incompetent," citing to 28 C.F.R. § 541.6 (which concerns disciplinary proceedings for mentally incompetent prisoners). (*Id.*)

Mr. Davis was notified that the matter would proceed to a hearing before a DHO. (Doc. 121-5.) The document providing notice of Mr. Davis's DHO hearing rights contains another citation to 28 C.F.R. § 541.6 and, on the signature block for the inmate's signature, reads "Blind, Incompetent," as well as what appears to be his signature. (*Id.*; *see also* Doc. 121-6 (indicating same)). Given Mr. Davis's assertions about competence, the DHO suspended the March 8, 2019 hearing and referred Mr. Davis for further evaluation. (Doc. 121 ¶ 16.) Dr. Alexandra Crouch, Psy.D., provided an evaluative report on March 20, 2019. (Doc. 121-4.) Dr. Crouch opined that Mr. Davis "has not been observed to be displaying any signs or symptoms consistent with actual psychotic symptoms," but rather, it is "suspected he is feigning mental illness in an effort to avoid consequences related to his incident report." (*Id.* at 5.) Dr. Crouch deemed Mr. Davis competent to undergo disciplinary proceedings and assist in his own defense, and opined that his actions giving rise to the incident report were not the product of a mental disease or defect impairing his ability to understand right from wrong. (*Id.*) Dr. Crouch's assessment was echoed by Dr. Gregory Mims, who, in a report dated April 16, 2019, opined that Mr. Davis "is most certainly physically and mentally capable of participating in the DHO process." (*Id.* at 10.)

Given the assessments of Drs. Crouch and Mims, the DHO resumed Mr. Davis's hearing on April 17, 2019. Mr. Davis had indicated he sought to have Dr. Mims as his staff representative to inform the DHO that "I'm totally blind and disabled." (Doc. 121-7 at 1.) Dr. Mims was not available for the hearing, but submitted the report referenced above. (*Id.*

at 2.) Mr. Davis did not request any other staff representative, but asked that two other witnesses be called: his former counselor, who, according to Mr. Davis, would say that he gave Mr. Davis the thumb drive; and his attorney, who would tell the DHO that Mr. Davis was incompetent. (*Id.*) The DHO found that the counselor was unavailable by virtue of their retirement, and that his competence was already fully addressed by two medical professionals. (*Id.*)

At the hearing, the DHO noted that Mr. Davis received the hearing notice 15 minutes beyond the 24-hour window (*see* 28 C.F.R. § 541.5(a)), but that the minor delay had no impact on Mr. Davis's ability to prepare a defense. (Doc. 121-7 at 2.) After informing Mr. Davis that Dr. Mims could not serve as a staff representative, and that Mr. Davis's lawyer and counselor would not be present as witnesses, the DHO asked Mr. Davis if he was ready to proceed. (*Id.*) Mr. Davis responded, "see you in court," and the hearing went forward. (*Id.*)

The DHO Report was issued on May 1, 2019, and provided to Mr. Davis on August 5, 2019. (*Id.* at 4.) The DHO found that the greater weight of the evidence supported the view that Mr. Davis had no justification for possessing the thumb drive. (*Id.* at 3.) The DHO found Mr. Davis to be not credible in several respects. Namely, the DHO found that Mr. Davis's assertions that he was incompetent were contradicted by the evaluations of two medical professionals, one of whom opined that Mr. Davis's assertion of incompetence was likely an attempt to evade disciplinary action. (*Id.*) The DHO also found that Mr. Davis's assertion that he was unable to proceed because he was "completely blind" was contradicted by his submission before the UDC, which is a detailed, full page of

27

handwritten notes. (*Id.*) According to the DHO decision, "[t]he DHO asked [Mr. Davis] 'How did you write such a detailed note if you were completely blind?' You just smiled at the DHO." (*Id.*) Given the uncontroverted evidence of Mr. Davis's possession of the drive, combined with the Mr. Davis's lack of credibility, the DHO found a violation occurred and imposed a sanction of 40 days of lost GCT. (*Id.*)

### D.    Incident Report 3354941

On January 21, 2020, a corrections officer noticed a "white paper like substance" on Mr. Davis during a search and ordered Mr. Davis to remove it. (Doc. 121-8 at 1.) Mr. Davis responded by threatening to kill the officer. (*Id.*) Mr. Davis was provided with a copy of the incident report about three and a half hours later. (*Id.*) Mr. Davis was advised of his rights and acknowledged his understanding. (*Id.* at 2.) He made a "no comment" statement about the incident. (*Id.*) Mr. Davis was advised of his right to appear before the UDC, but declined to do so. (*Id.* at 3.) The matter was then referred to a DHO to consider discipline. (*Id.* at 1.)

On January 28, 2020, Mr. Davis was informed of his rights related to a DHO hearing (Doc. 121-9.) The DHO held a hearing the next day. (Doc. 121-11 at 1.) Mr. Davis requested that K. Childress be present as his staff representative, but this officer was away from the institution in training. (*Id.* at 1.) The DHO substituted Unit Manager L. Custer as the staff representative without objection from Mr. Davis. (*Id.*) Mr. Davis indicated he understood his rights and the hearing process. (*Id.*) For his evidence, Mr. Davis stated that the charges were "fraudulently fabricated" and that "the Lieutenant never served me a shot." (*Id.*) No other witnesses or evidence was submitted by Mr. Davis. (*Id.* at 1–2.)

The DHO issued their report the same day as the hearing. (*Id.*) The report concluded that the greater weight of the evidence supported that Mr. Davis engaged in threatening conduct, relying on the reporting officer's assertion that Mr. Davis threatened to kill the officer. (*Id.*) The DHO considered Mr. Davis's defense that the officer's report was fabricated, but found it to be unsupported by any evidence. (*Id.*) Mr. Davis was sanctioned with a loss of 27 days of GCT. (*Id.* at 1.) A copy of the report was delivered to Mr. Davis the next day. (*Id.* at 2.)

\*      \*      \*

As is evident from the above summary, none of Mr. Davis's disciplinary proceedings were infected with constitutional infirmity. For each, he received timely notice of the charge, had at least one (and sometimes two) hearings, was offered the opportunity to present evidence, and received notice of the result of the proceeding. For each proceeding, the DHO report provided the basis of the DHO's decision, which was supported by some evidence in each circumstance. And the DHO's sanction in each proceeding was consistent with the misconduct.

It is true that not every proceeding went forward precisely by the book. For instance, a few DHO reports were provided to Mr. Davis months after they were written, contrary to BOP policy. But even if the Court were to construe the "several months' delay in Petitioner's receipt of the DHO Report" as "a failure by the BOP to follow its own policy, it is well established that a failure to follow BOP policy is not, by itself, enough to support a finding that procedures lacked due process under the Fifth Amendment." *Franklin v. Fikes*, 22-cv-646 (JRT/TNL), 2023 WL 8720331, at *4 (D. Minn. Oct. 31, 2023) (cleaned

29

up and quotation omitted), *R. & R. adopted,* 2023 WL 8719963 (D. Minn. Dec. 18, 2023). That is because the fact of delay does not violate due process, as opposed to *prejudice resulting* from such delay. *Id.* And Mr. Davis points to none.

Mr. Davis may also complain about being removed from his first two disciplinary DHO hearings, and that the BOP did not undertake any competency examinations before those proceedings despite Mr. Davis's assertion that he was not competent. But as was evident in the reports of each hearing, Mr. Davis was removed because he refused to participate *other* than to be belligerent, yelling and talking over the hearing officer while expressing racially-charged insults. At no point, however, did Mr. Davis appear to actually seek to address the charges against him. The Court cannot say that under those circumstances the hearing officer committed constitutional error by moving forward without Mr. Davis present. *Accord* 28 U.S.C. § 541.8(e)(2) (inmate appearance at DHO hearing may be prohibited where presence would jeopardize institution's security "at the DHO's discretion"). And as it related to Mr. Davis's competency, the DHO certainly could have postponed the proceedings to investigate Mr. Davis's competency further. But the Court will not second guess the DHO's decision not to do so based on the evidence before the officer. *Accord* 28 C.F.R. § 541.6(a) (DHO will make competency decisions based on evidence). Mr. Davis's assertions of incompetence do not make it so, and the DHO did not err in so deciding.

**VIII.   There is no habeas relief available for Mr. Davis's financial claims.**

In several of his Grounds,[15] Mr. Davis asserts that the BOP administered his trust fund account in an unlawful manner, resulting in funds not being applied to his criminal financial obligations and rendering him ineligible for FTCs for a period of time.

Inmates do not retain cash in prison; they receive, retain, and spend money through a trust fund operated by the BOP. *See generally* BOP Program Statement ("PS") 4500.12, *Trust Fund/Deposit Fund Manual*.[16] In order accept funds for an inmate, the BOP requires that the inmate execute a Power of Attorney assignment so that the BOP can endorse checks on behalf of the inmate. PS 4500.12, § 9.1(c). If a prisoner refuses to sign the BOP's Power of Attorney form, they are flagged as "No Power of Attorney" within the BOP's system. *Id.* The BOP will not accept checks on behalf of inmates with a "No Power of Attorney" notation; checks received for such inmates are supposed to be returned to the sender (or, if no address is available, to the issuing financial institution). *Id.*

According to BOP Regional Trust Fund Administrator Jason Stolze, it is "extremely rare for an inmate to have 'No Power of Attorney' flagged on their Trust Fund Account." (Doc. 125 at 2.) Although Mr. Stolze has worked for the BOP since 1993, he has only seen the "No Power of Attorney" flag "a handful of times." (*Id.*) Mr. Davis is within that handful. He "has repeatedly declined to authorize the BOP to sign his name as endorsement to deposit funds into his Trust Fund Account," reaffirming his intention as he was

---

[15] Specifically, Mr. Davis raises financial abnormality claims in Grounds 2, 8, 11, 26, and 37. (Doc. 42 at 7-9, 15, 21.)

[16] *Available at* https://perma.cc/H7LA-PTKP (last visited Jan. 18, 2024).

transferred from institution to institution. (*Id.*; *see also* Doc. 125-2 (BOP authorization forms in which Mr. Davis refused to authorize BOP to endorse negotiable instruments on his behalf).)

Mr. Davis received two checks from the United States Treasury: a $1400 stimulus check from the summer of 2021, and a $1350.10 check from the spring of 2022. (Docs. 125 at 3; 125-4; 125-5.) By the government's submissions, it appears that Mr. Davis has consistently refused to allow BOP endorsement of checks like these, and has never wavered from that position. (Doc. 125-2 at 1-5.) Under PS 4500.12, these checks were not to be deposited in Mr. Davis's trust account and should have been returned to the Treasury. PS 4500.12, § 9.1(c). But that is not what happened. Rather, both checks were deposited into Mr. Davis's trust fund account. (Docs. 125 at 3; 125-3.) At the time that these funds were deposited, Mr. Davis had significant unsatisfied PLRA debt from his civil filings.[17] (Doc. 125-3.) The $1400 check was immediately and fully encumbered for Mr. Davis's PLRA obligations, ultimately leaving less than $10 in his account within a month. (*Id.* at 4-5; *see also* PS 4500.12 § 10.1 (granting BOP authority to make withdrawals from inmate trust accounts for PLRA filing fees without inmate authorization). Likewise, Mr. Davis's entire $1350.10 check was encumbered the day it was deposited, within a month leaving him with only $10 in his account. (Doc. 125-3 at 8.)

---

[17] Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not need to pay the entire filing fee to commence a civil action, but "shall be required to pay the full amount" over time as funds become available. *See generally* 28 U.S.C. § 1915.

Mr. Davis appears to be correct in asserting that the BOP disregarded its own program statement, his limited right to financial autonomy, and potentially violated the law when it endorsed checks for him without his authorization. The government may be right that the way Mr. Davis managed his BOP financial account was enigmatic. Nonetheless, that is his choice, and there appears no excuse for the government's failure to honor it. But habeas is not a vehicle intended to right every wrong. Rather, habeas petitions are only cognizable to the extent they challenge the legality or length of a prisoner's detention. *Spencer*, 774 F.3d at 469.

Given Mr. Davis's individual circumstances, the legality or length of his detention are not implicated by the BOP's actions. It is true that the increased money in Mr. Davis's trust account resulted in the BOP treating him as if he had more money in his account than he actually did, since the funds were immediately encumbered. This consequently led the BOP to conclude Mr. Davis had refused his financial obligations to pay his criminal court assessments and restitution. (Doc. 126 at 5.) And because of this, from November 16, 2021 through February 22, 2022, and October 6, 2022 through October 26, 2022, the BOP listed Mr. Davis as in "FRP[18] Refuse" status.[19] (Doc. 126-8 at 1-2.) The government concedes that Mr. Davis's FTCs were disallowed while he was on "FRP Refuse" status. (Doc. 126 at 7.) For another prisoner, the loss of these FTCs could state a cognizable habeas claim,

---

[18] "FRP" refers to the Financial Responsibility Program, sometimes also referred to as the Inmate Financial Responsibility Program. *See* 28 C.F.R. §§ 545.10 & .11.

[19] Mr. Davis was also in "FRP Refuse" status from December 17, 2019 through April 28, 2020 (*see* Docs. 126 at 7; 126-9 at 1), but he makes no habeas allegations about this period of time.

since FTCs may shorten a prison term. But as set forth above in Section V, Mr. Davis has already reached the maximum amount of FTCs that can be applied to early release. Habeas relief is not available to further reduce Mr. Davis's prison sentence beyond the statutory cap.

## XI.    Mr. Davis's remaining claims.

Some of Mr. Davis's remaining claims defy easy description, while others merit little discussion.[20] He asserts as independent claims (in Grounds 10 and 50) that the BOP's administrative remedy program is effectively unavailable to him because he gets harassed when he complaints. (Doc. 42 at 9, 23.) To the extent that Mr. Davis is seeking to excuse his failure to exhaust administrative remedies, *see Mathena v. United States*, 577 F.3d 943, 946 (8th Cir. 2009), this Court has addressed his claims on their merits regardless of any failure to exhaust. Mr. Davis also asserts in the BOP has violated some of their program statements, been nonresponsive to him at times, and not provided him with all of the legal supplies that he desires. (Doc. 42 at Grounds 9, 10, 12, 17, 23, 44, 46, 48.) These are generally not cognizable habeas claims, *see Spencer*, 774 F.3d 469–70, and specifically not here.[21] Mr. Davis asserts he is the victim of retaliation in violation of his First Amendment rights in Grounds 17, 25, 26, and 38 (Doc. 42 at 12–15, 21), but again, habeas is not the vehicle for such claims. Mr. Davis also faults the BOP for not managing his care in a way that would have allowed him early "release," but these complaints appear to

---

[20] Mr. Davis's petition includes no Ground 29, explaining the omission of any analysis of Ground 29, and two Ground 46s.

[21] The Court addressed Mr. Davis's claims that he had been deprived legal supplies in an earlier Report and Recommendation and Order as well. (Docs. 111, 128.)

implicate community confinement. (*Id.* at 21–22 (Grounds 39, 44, 46, and 48).) As discussed at length in Section II, there is no habeas relief available for such claims. In Ground 50 of Mr. Davis's habeas petition, he seeks declaratory and injunctive relief. (*Id.* at 23.) It is true that habeas is an equitable remedy, but here there is no basis for relief at all, so his requests fail.

## X.    Additional matters.

Mr. Davis has also filed a number of other motions, including a motion for sanctions (Doc. 48), a motion for a temporary restraining order (Doc. 62), a "standing" motion for appointment of counsel (Doc. 82), and two discovery motions (Docs. 96, 104). The Court finds that Mr. Davis's motion for sanctions has no merit and denies it. His motion for a temporary restraining order merely repeats complaints made and rejected by this Court and the Court thus recommends it be denied for the same reasons. (Doc. 111). His motion seeking the appointment of counsel likewise fails for the same reasons as in his previous motions for counsel. (Docs. 10, 60.) As for Mr. Davis's discovery motions, habeas discovery is only available for good cause, *see Fiorito v. Fikes*, 22-cv-0512 (WMW/TNL), 2022 WL 7341963, at *3 (D. Minn. Sept. 13, 2022), *aff'd*, 2023 WL 129093 (D. Minn. Jan. 9, 2023), and good cause does not exist here. Thus, the Court denies both motions. The Court's decision is based on undisputed record evidence that leaves no room for doubt. Mr. Davis also requests copies of his docket sheets in this case as well as his underlying criminal case. (Doc. 105.) The Court grants this motion in part. The Clerk of Court is directed to mail Mr. Davis a copy of the docket in this case. Should he desire the docket in

his underlying criminal case, that request is best considered by the court of original jurisdiction.

Finally, the Court concludes there is no basis for an evidentiary hearing. Mr. Davis's petition was fulsome, as was the government's responsive pleadings and submissions. In reviewing those submissions, the Court discerned no material facts in dispute. As such, no evidentiary hearing is necessary to decide Mr. Davis's claims. *Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994).

## ORDER

Based on the all the files, records, and proceedings above, **IT IS ORDERED** that:

1. Petitioner William Scott Davis, Jr.'s Motion for Sanctions (Doc. 48) is **DENIED**;

2. Mr. Davis's Standing Motion for Appointment of Counsel (Doc. 82) is **DENIED**;

3. Mr. Davis's Motion for Respondents Production (Doc. 96) is **DENIED**;

4. Mr. Davis's Motion (Doc. 104) that concerns discovery is **DENIED**; and

5. Mr. Davis's Motion (Doc. 105) seeking copies of his court filings is **GRANTED IN PART** and **DENIED IN PART**. The Clerk of Court is directed to mail Mr. Davis a copy of the docket in this case.

## RECOMMENDATION

Based on the all the files, records, and proceedings above, **IT IS RECOMMENDED** that:

1. Mr. Davis's Amended Petition (Doc. 42) seeking federal habeas corpus relief be **DENIED**;

2. Mr. Davis's Motion (Doc. 54) brought under 28 U.S.C. § 2255 be **DENIED**; and

3. Mr. Davis's Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 62) be **DENIED**.


Date: January 19, 2024                    *s/Douglas L. Micko*
                                          DOUGLAS L. MICKO
                                          United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served with a copy" of the Report and Recommendation.

A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).